1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TROY MABON,                              No.  2:13-cv-2208 WBS KJN P

12             Plaintiff,

13        v.                                  FINDINGS AND RECOMMENDATIONS

14   SWARTHOUT, et al.,

15             Defendants.

16

17   I.  Introduction

18        Plaintiff is a state prisoner, proceeding pro se, with a civil rights action.  Plaintiff raises

19   due process, and Eighth Amendment claims against defendants Marquez, Jefferson, Swarthout,

20   McGriff, Soria, Yehuda, Blackwell, Arthur, Stauss, Hardy, and Jackura.  Defendants' motion for

21   summary judgment is before the court.  As set forth below, the undersigned finds that defendants'

22   motion for summary judgment should be denied in part, and granted in part.

23   II.  Plaintiff's Complaint

24        The gravamen of plaintiff's complaint is that while he was housed at California State

25   Prison, Solano (CSP-SOL), he was wrongfully validated as a gang member of the Black Guerilla

26   Family prison gang ("BGF"), resulting in his placement in administrative segregation for two and

27   one-half years.  Further, plaintiff alleges that the source items used to validate plaintiff were not

28   investigated or verified, and he alleges numerous due process violations concerning various

1

1    hearings to continue to classify him as a BGF member.  Specifically, plaintiff alleges that on March

2    23, 2011, Special Agents V. Marquez and J. Jefferson wrongfully validated plaintiff as a BGF

3    member based on unreliable evidence.  (ECF No. 1 at 17.)  Plaintiff also alleges that defendants

4    Warden Swarthout, C. McGriff, Lt. R. Soria, Y.B. Yehuda, Lt. Blackwell, Associate Warden

5    Arthur, Captain C. Stauss, Associate Warden L. Hardy, and S. Jackura violated plaintiff's due

6    process rights by, *inter alia*, violating the <u>Castillo</u> Agreement, by failing to investigate source

7    documents, failing to tie source documents to plaintiff, by placing plaintiff in administrative

8    segregation based on an unlawful laundry list, and by denying plaintiff witnesses at classification

9    hearings.  Plaintiff seeks declaratory and injunctive relief as well as money damages.  (ECF No. 1

10   at 3, 23.)

11   III.  <u>Defendants' Motion for Summary Judgment</u>

12        Defendants move for summary judgment on the grounds that although plaintiff's gang

13   validation was subsequently overturned in 2013, plaintiff received notice of the charges against

14   him, he had multiple opportunities to be heard by prison officials, and the evidence in support of

15   his 2011 gang validation exceeded the minimum "some evidence" threshold required by federal

16   due process law.  In addition, defendants contend that they are entitled to qualified immunity

17   because it was not clearly established in 2010 to 2011 that extended housing in the ASU pending

18   investigation of gang involvement and after validation constituted an atypical and significant

19   hardship, and it would not have been beyond debate among reasonable officials that relying on

20   the source items used to validate plaintiff was unconstitutional.

21        Further, defendants contend summary judgment is appropriate because:  plaintiff did not

22   exhaust his administrative remedies as to defendants Blackwell, Marquez, and Jefferson, and

23   defendants at the November and December 2010, and April 2011 ICC (Inmate Classification

24   Committee) hearings; plaintiff's claims against defendants Stauss and Jackura do not rise to the

25   level of a constitutional violation; the Eleventh Amendment bars money damages against

26   defendants in their official capacities; and plaintiff's request for injunctive relief directly

27   interferes with the substantial discretion owed prison administrators and thus falls outside the

28   court's purview.

In opposition, plaintiff alleges that defendants violated plaintiff's due process rights when he was twice placed in the ASU on false charges of gang activity, and plaintiff was twice cleared of such involvement by the Institutional Gang Investigator.  Plaintiff argues that the evidence used to validate him as a gang member does not meet the minimum due process threshold under federal law because defendants violated clearly established rules, regulations, and case law in effect at the time.  Plaintiff contends that defendants are not entitled to qualified immunity because each defendant personally participated in the alleged violations that led to plaintiff's liberty being taken away.  He contends that his allegations as to defendants Jackura and Stauss rise to the level of a constitutional violation based on their "concerted efforts, and [conclusory] practices, [and] for falsifying state documents in violation of California Penal Code § 134."  (ECF No. 58 at 2.)

Further, plaintiff claims he exhausted administrative remedies against all defendants because he received a third level response, with the exception of those in which he was obstructed from filing an appeal due to retaliation or the denial, cancellation or rejection of such appeal.  Plaintiff argues that he can obtain money damages against defendants in their personal capacities.  Plaintiff contends that he can obtain injunctive relief where he has or will continue to suffer harm at the hands of defendants.  (ECF No. 58 at 4.)  In addition, plaintiff claims that the 2013 finding that the gang validation order should be overturned demonstrates that the 2011 validation was in error.  Plaintiff also relies on his verified pleading.  (ECF No. 58 at 27-52.)

In reply, defendants argue that the majority of plaintiff's opposition relies on a re-examination of the proceedings and evidence related to his initial validation as a member of the BGF prison gang, but that the claims at issue in this litigation solely relate to federal due process, limiting this court's inquiry into whether plaintiff received notice and an opportunity to be heard, and that the initial validation met the minimally stringent "some evidence" standard.  (ECF No. 63 at 1.)  Defendants contend that plaintiff received all the process he was due, but that even assuming a due process violation occurred in plaintiff's initial placement in the ASU, validation proceedings, or the continued retention in the ASU, defendants are "shielded from liability for mistakes of fact and law by the doctrine of qualified immunity."  (ECF No. 63 at 2.)

1    Further, defendants argue that plaintiff failed to demonstrate that a triable issue of fact

2    remains as to whether his administrative remedies against defendants Blackwell, Marquez,

3    Jefferson, Swarthout, Arthur, and McGriff were exhausted or rendered "effectively unavailable."

4    (ECF No. 63 at 2.)  Defendants contend that plaintiff also failed to establish causation between

5    the action or inaction of defendants Stauss and Jackura and the alleged constitutional

6    deprivations.  Finally, defendants argue that plaintiff is not entitled to injunctive relief and may

7    not pursue official-capacity claims against defendants.

8    IV.  Legal Standard for Summary Judgment

9    Summary judgment is appropriate when it is demonstrated that the standard set forth in

10   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

11   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

12   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party always bears the

13   initial responsibility of informing the district court of the basis for its motion, and identifying

14   those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

15   together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

16   of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered

17   Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving

18   party need only prove that there is an absence of evidence to support the non-moving party's

19   case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

20   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

21   56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have

22   the trial burden of production may rely on a showing that a party who does have the trial burden

23   cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

24   judgment should be entered, after adequate time for discovery and upon motion, against a party

25   who fails to make a showing sufficient to establish the existence of an element essential to that

26   party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

27   U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

28   party's case necessarily renders all other facts immaterial."  Id. at 323.

4

1    Consequently, if the moving party meets its initial responsibility, the burden then shifts to

2    the opposing party to establish that a genuine issue as to any material fact actually exists.  See

3    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4    establish the existence of such a factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material in support of its contention that such a

7    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

12   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

13   (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

14   1564, 1575 (9th Cir. 1990).

15   In the endeavor to establish the existence of a factual dispute, the opposing party need not

16   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

17   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

18   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

19   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

20   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

21   amendments).

22   In resolving a summary judgment motion, the court examines the pleadings, depositions,

23   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

24   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

25   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

26   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

27   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

28   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on August 25, 2015 (ECF No. 36-3), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

V.  Facts[1]

1.  Plaintiff Troy Mabon (V-70737) was incarcerated at California State Prison, Solano (Solano) between October 30, 2010, and November 9, 2011.

2.  Plaintiff filed this lawsuit on October 17, 2013.

3.  Defendant Swarthout was Warden at Solano during all times relevant to this action.

4.  Defendant Soria was Lieutenant of the Institutional Gang Investigator ("IGI") at Solano at all times relevant to this lawsuit.

5.  Defendant McGriff was a Correctional Officer in the Investigative Services Unit ("ISU") at Solano at all times relevant to this action.

6.  Defendant Blackwell was a Lieutenant at Solano at all times relevant to this lawsuit.

7.  Defendant Yehuda was a Correctional Officer at Solano at all times relevant to this action.

8.  The Black Guerilla Family ("BGF") prison gang is the supreme Black prison gang in California.  (ECF No. 37-5 at 3.)  It was founded in the early 1960s to promote African-American Marxist revolutionary ideologies among black inmates.  BGF was founded with the stated goals of eradicating racism and maintaining dignity in prison, while at the same time controlling black

---

[1]  Defendants provided a corrected statement of undisputed facts (ECF No. 51), and plaintiff submitted "answers" to defendants' undisputed facts (ECF No. 58 at 83-98).  For purposes of the pending motion, the following facts are found undisputed, unless otherwise indicated.

1  inmates for illicit purposes.

2      9.  On October 30, 2010, Lieutenant Blackwell issued a CDC 114-D Administrative

3  Segregation Unit Placement Notice to plaintiff advising of his placement into the ASU

> pending investigation into the allegations of threats against Peace
> Officer and Prison gang activity.   Specifically, confidential
> information was received identifying [plaintiff's] involvement in
> conspiring to batter a Peace Officer orchestrated by the Prison Gang
> Black Guerilla Family (BGF).   Refer to CDC-1030 authored by
> Correctional Officer Yehuda dated 10/30/10.    Based on the
> aforementioned, [plaintiff is] deemed a threat to the safety and
> security of the institution its staff and inmates.

(ECF No. 37-3 at 6; see also Pl.'s Dep. at 45, 46.)

10      10.  On October 30, 2010, defendant Yehuda received information from a confidential

11  inmate informant that plaintiff and others were members involved in gang activity.[2]

12      11.  Defendant Yehuda was required to document the information he received from the

13  confidential informant.

14      12.  Plaintiff was previously placed in the ASU for alleged involvement in a conspiracy to

15  batter a peace officer, but was released on October 28, 2010.[3]

16      13.  On October 30, 2010, plaintiff met with defendants Lt. Blackwell and Officer Yehuda

17  on October 30, 2010, and was told why he was being placed in the ASU.

18      14.  After January 28, 2011, inmates using the prison grievance process were also required

19  to identify all staff members involved, and describe their involvement.

20      15.  The only appeal against defendant Blackwell that plaintiff identified in his deposition

21  is Appeal Log No. CSP-S-12-00487, which plaintiff dated March 21, 2012.  Plaintiff testified that

22  he referred to defendant Blackwell as "Jane Doe" in such appeal.[4]  (Pl.'s Dep. at 78-81.)

---

[2]  Plaintiff contends this fact is disputed, claiming that "this informant never mention[ed] nothing about [plaintiff] that ever or could ever tie [plaintiff] to his false claims of a staff plot or . . . conspiracy."  (ECF No. 58 at 85.)  However, plaintiff fails to demonstrate that he has personal knowledge of the communication between the confidential informant and Yehuda.

[3]  Plaintiff contends that he was "illegally" placed in the ASU because he was later cleared in the October 20, 2010 staff plot.  (ECF No. 58 at 85.)

[4]  Plaintiff disputes that the March 21, 2012 appeal was the only appeal in which he referred to

16.  In connection with Appeal CSP-S-12-00487, neither plaintiff's written dissatisfaction with the second level response, nor any of the appeal response letters reflect that defendant Blackwell's identity ever became known to the Appeals Office.

17.  Appeal Log No. CSP-S-12-00487 complained that plaintiff's Form 602s had been unjustly screened out but does not mention plaintiff's placement in the ASU on October 30, 2010.

18.  There is no record of plaintiff submitting an appeal -- accepted or screened out -- within fifteen days of October 30, 2010.  (ECF No. 39-3 at 6-9.)[5]

19.  The CDC-114-D, dated October 30, 2010, reflects that plaintiff met with the Administrative Reviewer, defendant Captain Arthur, on November 1, 2010, who determined that plaintiff should remain in the ASU.

20.  On November 4, 2010, Solano's ICC held a hearing attended by plaintiff, defendants Swarthout, Arthur, McGriff, and other non-parties to this action, to review plaintiff's retention in in the ASU.  The hearing minutes were held in a CDC 128-G classification chrono.

21.  At the November 4, 2010 hearing, the ICC reviewed the evidence against plaintiff and determined that he would be retained in the ASU pending completion of an ongoing investigation. Plaintiff expressed his disagreement with the ICC's decision.

22.  On December 20, 2010, defendant Lt. Soria issued a new CDC 114-D explaining that plaintiff posed a threat to the safety and security of the institution based on sufficient evidence to

---

defendant Blackwell.  The second page of the attachment to the November 28, 2010 appeal identifies Lt. Blackwell in a paragraph entitled, "Conclusion," that is set forth after and below plaintiff's signature.  (ECF No. 58 at 104.)  However, as discussed below, the appeal dated November 28, 2010, bears no stamps or other indicia confirming that it was received by prison officials.  (ECF No. 58 at 102.)

[5]  Plaintiff contends that he filed an appeal as a staff complaint on both defendants Yehuda and Blackwell on November 3, 2010, but such appeal was "screened out" by the appeals coordinator, citing pages 3, 6, 9, 13 and 17 of plaintiff's inmate tracking appeal log.  (ECF No. 58 at 87.) However, review of such pages reveals no dates and no identifying information for the appeals circled by plaintiff.  (ECF No. 58 at 108, 111, 114, 118, 122.)  Moreover, these tracking records are maintained in chronological order.  On plaintiff's page 9, he handwrote in the dates of 11/3/10 and 11/28/10, but his entries fall in between appeals filed June 2, 2011 and October 28, 2011. (ECF No. 58 at 114.)  Thus, the appeals circled by plaintiff could not have been filed in 2010 or within fifteen days of October 30, 2010, because the appeals he circled were received at some point between June 2 and October 28, 2011.  (Id.)

8

1    validate him as an associate[6] of the BGF.

2        23.  All gang validation investigations must go through the Institutional Gang Unit or their

3    designees.

4        24.  Defendants Swarthout, Arthur, Blackwell, Hardy, Jackura, Stauss, or Yehuda did not

5    have any involvement in preparing or serving plaintiff's gang validation package.

6        25.  Defendants contend there is no difference in the quantity or quality of source items

7    needed to validate an inmate as a gang member or as an associate.  (ECF No. 37-5 at 14.)

8    Plaintiff disputes this statement, claiming that a member is an inmate who has been accepted into

9    gang membership, but that an associate is an inmate involved periodically or regularly with gang

10   members or associates; such association needs to be explained and well-documented, and that

11   mere association without gang activity is not unlawful.  (ECF No. 58 at 88.)  However, plaintiff

12   confirms that Cal. Code Regs. tit. 15, § 3378(c)(3) requires at least three independent source

13   items to validate an inmate as a gang member or as an associate.  (ECF No. 58 at 88.)

14       26.  On December 22, 2010, defendants IGI Lt. Soria and Correctional Officer McGriff

15   served plaintiff with a gang-validation package, containing five source items.[7]

16       27.  Plaintiff's validation package included a CDCR-128-B chrono (CDCR 128B-

17   Thomas), dated November 10, 2010, from McGriff that documented a piece of paper found in

18   plaintiff's property.  The paper contained the name of a validated BGF member (Spencer

19   Thomas) and address confirmed by McGriff's investigation to be that of Thomas's mother (978

20   69th Ave., Oakland, CA).[8]

21   _____

22   [6]  Defendant Soria declares that Soria made a typographical error on the placement notice by indicating that plaintiff was recommended for validation as an "associate" of BGF, rather than as

23   a member, but avers that such typographical error did not change the quantity of the source items needed to validate plaintiff.  (ECF No. 37-5 at 14, ¶20.)  Soria confirmed that the evidence presented to Soria indicated that plaintiff was a member of the BGF.  (ECF No. 37-5 at 15, ¶23.)

24

25   [7]  Plaintiff denies this fact, but he does not deny that he was served with the gang-validation package.  (ECF No. 58 at 89.)  Rather, plaintiff denies that the evidence or source items

26   demonstrated he was a gang member.  (Id.)

27   [8]  Plaintiff admits that Thomas was validated at the time of plaintiff's validation, but contends that he received the address from Thomas in 2005 at which time plaintiff did not know Thomas was a

28   gang member or gang associate.  (ECF No. 58 at 89.)

1    28.  Plaintiff admitted to possessing Spencer Thomas's contact information and argued

2    that a CDCR 128-B General Chrono, which was written by a Correctional Officer and dated April

3    10, 2005, authorized him to possess it.  The chrono indicates that plaintiff and Thomas asked the

4    officer to document that Thomas was giving plaintiff his attorney's contact information (978 69th

5    Ave., Oakland, CA) so that plaintiff could subpoena Thomas in his criminal case.

6    29.  Prison-gang operations depend upon the gangs' ability to organize and maintain open

7    lines of communication. Communication is vital to promote the gang, to coordinate the gang's

8    illegal activities, and to recruit and train new gang affiliates.  Gang affiliates often retain the

9    names and CDCR numbers of fellow gang-affiliates for years because this information can be

10   used to facilitate communication.

11   30.  Plaintiff did not have permission from a prison official at the level of correctional

12   captain or higher, to possess the address of another inmate or parolee, as required under Cal. Code

13   Regs. tit. 15 § 3139.  Plaintiff contends he did not have the address of inmate Thomas in order to

14   correspond with the inmate, but so that plaintiff's attorney could contact Thomas in connection

15   with plaintiff's appeal.[9]

16   31.  Another CDCR 128-B, dated November 10, 2010, from McGriff documented

17   plaintiff's possession of a piece of paper containing the name "Yero Askari," and an Oakland

18   address (819 59th Street, Oakland, CA 94609) on it.[10]

19   32.  Plaintiff denied any knowledge of and connection with Taylor and claimed that the

20   alias belonged to a non-BGF "associate" of his named Michael Anthony Washington.

21   33.  McGriff also documented a piece of paper found in plaintiff's property that contained

22

23   [9]  Plaintiff claims such possession was authorized under Cal. Code Regs. tit. 15 § 3163.  (ECF
24   No. 58 at 90.)  However, Section 3163 governs one inmate assisting another in the preparation of
     legal documents.

25   [10]  Defendant McGriff noted that his investigation revealed that the alias belonged to a validated
26   BGF member (Freddie Taylor) who was housed at San Quentin.  Plaintiff claims that the
     nickname "Yero Askari" belonged to Michael Anthony Washington, and the address 819 59th
27   Street belonged to Mr. Washington's girlfriend.  (ECF No. 1 at 11.)  In his opposition, plaintiff
     contends the use of this item as a source item violated DOM Section 52070.18.2 because the
28   name could not be tied to the address to which it was attached.  (ECF No. 58 at 91.)

1   the words "Regime Guerrilla" and "Dragon Regime." The evidence was submitted as a written

2   material link toward validating plaintiff as a BGF member.

3          34.  In his written rebuttal, plaintiff admitted to possessing the pieces of paper

4   documented in the three CDCR-128-B chronos, dated November 10, 2010, by McGriff.  Plaintiff

5   claimed they were references from a hip hop magazine that he wrote down so that his fiancé

6   could print a rapper's lyrics for him.

7          35.  Defendants Soria and Marquez aver that as of 2010 and 2011, the Office of

8   Correctional Safety (OCS) established the terms "dragon" and "guerrilla"/"gorilla" as being

9   references and identifiers used by the BGF.  (ECF Nos. 37-5 at 13-14; 37-4 at 9.)  Plaintiff

10   disputes this fact on the grounds that the BGF is not the only organization who uses such

11   monikers.  (ECF No. 58 at 92.)

12          36.  Plaintiff's validation package contained two Confidential Memoranda in which an

13   informant implicated plaintiff in gang activity, authored by Sgt. Guillory and defendant

14   Correctional Officer Yehuda.[11]  Prison officials gave plaintiff notice of these memoranda and

15   their general content in two CDC 1030 Confidential Information Disclosure Forms, both dated

16   December 22, 2010, and signed by defendant McGriff.

17          37.  More than twenty-four hours later, on December 23, 2010, plaintiff provided

18   defendants Soria and McGriff with a copy of plaintiff's written rebuttal denying gang

19   involvement and addressing all documents used in the validation package.[12]  (ECF No. 1 at 5, 7.)

20          38.  After determining that plaintiff's rebuttal evidence did not sufficiently refute the

21   evidence indicative of his gang membership, defendant Soria forwarded plaintiff's validation

---

[11]  Plaintiff disputes this fact, claiming that the confidential information violated the single source
rule prohibited by the Castillo settlement, and wrongfully relied on a laundry list.  (ECF No. 58 at
93.)  However, it is undisputed that plaintiff was not provided access to the confidential
memoranda, which were submitted for *in camera* review.  (ECF No. 57.)  In any event, the
confidential memoranda were not relied upon to validate plaintiff as a gang member.

[12]  Defendants Soria and McGriff aver that plaintiff was interviewed on December 23, 2010, and
given an opportunity to respond.  (ECF No. 37-5 at 14, 21.)  Plaintiff declares that there was no
interview.  (ECF No. 58 at 94, 320-22.)  But plaintiff does not dispute that he submitted his
written rebuttal to them.  (ECF No. 58 at 94 [the "only thing that was submitted to OCS was my
validation package & rebuttal."].)

1   package to the OCS for review and validation of plaintiff as a BGF member.

2       39.  An ICC hearing was held for plaintiff on December 23, 2010, and attended by

3   defendants Swarthout, Arthur, and McGriff.

4       40.  On December 23, 2010, the ICC denied plaintiff's request for witnesses.[13]  The ICC

5   also extended plaintiff's ASU stay by 180 days pending a decision on his validation.

6       41.  At the December 23, 2010 hearing, plaintiff contends that multiple due process

7   violations occurred based on the denial of his various requests.

8       42.  In 2010-2011, OCS made the final decision as to whether an inmate was validated as

9   a gang member.

10      43.  Defendants Marquez and Jefferson are Special Agents with OCS, and validated

11  plaintiff as a BGF member.

12      44.  Based on information provided in plaintiff's gang-validation package, defendants

13  Marquez and Jefferson determined that plaintiff had received an opportunity to express his views

14  regarding the evidence supporting the validation and at least twenty-four hours' notice.

15      45.  On March 23, 2011, defendants Marquez and Jefferson reviewed plaintiff's validation

16  package and determined that it was sufficiently supported by three acceptable source items and

17  met the criteria for validation in Title 15, Section 3378, and they signed a CDCR 128-B-2

18  validating the inmate.

19      46.  Because defendants Marquez and Jefferson validated plaintiff, he was deemed to be

20  an active member or associate of a prison gang at that time.[14]

21      47.  Plaintiff did not successfully file any appeals identifying defendants Marquez and

22  Jefferson for their role in his validation.  Plaintiff contends that the "CDCR thwarted plaintiff's

23  appeals."  (ECF No. 58 at 96.)

24  _____

25  [13]  Defendants contend that the witnesses were denied after determining that they would not
    provide any relevant evidence to refute the need to keep plaintiff in the ASU.  Plaintiff argues that
26  his requested witnesses would have offered evidence to support his claim that he is Muslim and
    not a BGF gang member.  (ECF No. 58 at 95; Pl.'s Dep. II at Ex. AA.)

27
    [14]  Plaintiff contends that Marquez and Jefferson did not review the "whole record" or plaintiff's
28  arguments.

48. On April 15, 2011, defendant Soria issued a new CDC 114-D indicating that plaintiff was validated as a BGF member and, thus, posed a threat to the safety and security of the institution and others.

49. At the April 21, 2011 ICC hearing attended by defendants Swarthout, McGriff, and Arthur, plaintiff was given notice and an opportunity to be heard.

50. At the April 21, 2011 hearing, plaintiff complained that he had not been able to present evidence against his validation. The ICC decided to retain plaintiff in the ASU and referred the matter to the CSR for transfer to an appropriate SHU facility.

51. On April 22, 2011, defendants Swarthout, McGriff, and Soria met with plaintiff for approximately one hour to allow Mabon an opportunity to present his evidence against the validation decision, which defendant Swarthout determined were too complex and extensive to address at the April 21, 2011 ICC hearing.

52. In compliance with defendant Swarthout's instruction to further investigate plaintiff's claims after the April 22, 2011 meeting, defendant Soria called Stevens and determined that he could not corroborate plaintiff's claim that Michael Anthony Washington went by the alias "Yero Askari."[15]

53. CDCR's Office of Internal Affairs ("OIA") did not order defendant Swarthout to investigate plaintiff's claims.

54. Of all plaintiff's appeals challenging gang validation, only Appeal Log No. CSP-S-11-00229 received a final decision at the third level of review before plaintiff filed this action.[16]

---

[15]  Plaintiff admits this fact "only on the grounds the court has not viewed Stevens' affidavit of truth that's forthcoming." (ECF No. 58 at 96.) However, plaintiff does not indicate what the affidavit will state, when he sought the affidavit, or when he expects it to be filed. Moreover, plaintiff was granted multiple extensions of time to file an opposition to the August 25, 2015 motion for summary judgment. The court deems this fact admitted for purposes of summary judgment.

[16]  Plaintiff denies this fact, claiming that the "CDC thwarted every appeal [he] filed after this appeal," and "all of these appeals received third level decisions under 1997E once his appeals were unjustly denied and cancelled." (ECF No. 58 at 96, 98.) However, 42 U.S.C. § 1997e(a) does not create a third level decision where none previously existed. Rather, as explained more fully below, when an inmate's grievance is improperly rejected on procedural grounds, exhaustion may be excused as effectively unavailable. Sapp v. Kimbrell, 623 F.3d 813, 823 (9th

13

55.  In Appeal Log No. CSP-S-11-00229, plaintiff argued that he had been improperly validated as an active BGF member because the validation was not supported by facts, the evidence against him did not meet the criteria of California Code of Regulations, Title 15, Section 3378, and there was insufficient evidence to support his validation.

56.  Another ICC hearing was held for plaintiff on August 25, 2011, and attended by plaintiff, and defendants Hardy, and Jackura.  Plaintiff was given notice before the hearing and an opportunity to be heard.  The ICC retained him in the ASU pending his transfer to a SHU facility. Plaintiff expressed his disagreement and said that he had not been allowed to present evidence to OCS to refute his validation.

57.  Defendant Stauss is not listed as attending plaintiff's ICC hearings between November 4, 2010, and November 9, 2011, and the minutes from these ICC hearings do not reflect that plaintiff handed anything to defendant Stauss.  (ECF No. 37-3 at 8, 10, 12-13.)  In his deposition, plaintiff did not name defendant Stauss as attending plaintiff's ICC hearings between November 4, 2010, and November 9, 2011.[17]  (Pl.'s Dep. at 250 (11/4/10 hearing); 255 (12/23/10 hearing); 296-97 (4/21/11 hearing); 308 (8/25/11 hearing).)

However, in responding to plaintiff's September 7, 2011 appeal concerning the 8/25/11 hearing, CCI N. Danbacher wrote "The form 22 was delivered to Capt. Stauss on the day of committee.  Evidence was given to Capt. Stauss during committee to be forwarded to OCS for review."  (ECF No. 58 at 418.)  In an August 29, 2011 administrative segregation case manager progress note, M. Smith, Ph.D., commented that:

> On 8-25-11 Pt. [plaintiff] appeared in ICC & gave papers telling of staff (identifying) who were selling & bringing cell phones, payment method, etc. -- * note --
>
> *note:  the papers were to be copied & a set returned to Pt. @ 1630 prior to [illegible].   I found his paperwork identifying involved

Cir. 2010).

---

[17]  In his opposition, plaintiff denies this is an undisputed fact on the grounds of supporting evidence submitted at his deposition, citing pages 75, 94, 95 and 96. (ECF No. 58 at 97.)  But the documents appended to plaintiff's deposition do not bear such page numbers, and it does not appear that 96 pages of exhibits were submitted at the deposition.  In any event, plaintiff failed to adequately describe the evidence for the court's review.  (ECF No. 58 at 97.)

1   officers on the custody lunchroom table.  I document in case there
    is retaliation.
2

3   (ECF No. 1-2 at 79.)  In his deposition, plaintiff confirmed that M. Smith was present in the ICC

4   hearing when plaintiff gave Stauss the papers, and plaintiff confirmed that Smith told plaintiff

5   that when she went home, the papers were still in the staff room.  (Pl.'s Dep. at 354.)

6       58.  Plaintiff's only claim against defendant Jackura is for failing to take accurate notes at

7   the ICC hearing.[18]

8       59.  Defendants contend that plaintiff's only evidence to support his claim that defendants

9   Jefferson and Marquez failed to investigate or verify the evidence provided in his validation

10  package, is the presence of the April 10, 2005 chrono in his Central File.  (ECF No. 1 at 17-18.)

11  Plaintiff disputes this fact, citing his Exhibit DD, an "affidavit sent to OCS," and refers to

12  "Exhibits A through 11B attached to this motion for and to oppose defendants summary

13  judgment."  (ECF No. 58 at 97.)

14      60.  Plaintiff knew about and used the administrative grievance process while at Solano.

15      61.  Plaintiff's appeal records show that he submitted an appeal related to segregation

16  hearings sometime between June 2, 2011, and October 31, 2011, but it was screened out.[19]

17      62.  Plaintiff did not exhaust administrative remedies for alleged due process violations at

18  the ICC hearings on November 4, 2010, December 23, 2010, and April 22, 2010, because he did

19  not obtain a third and final level decision regarding those issues.[20]

20      63.  To avoid detection by correctional staff, prison gangs commonly use the addresses of

21  third parties such as friends or family members to forward to another inmate.  (ECF No. 37-5 at

22

23  [18]  Plaintiff claims that Jackura left evidence out of the record while acting as an agent of another
    of these officials and tried to cover this matter up so plaintiff "could not appeal it under People v.
24  Duval [sic] evidence submission."  (ECF No. 58 at 97.)

25  [19]  Plaintiff denies this fact, stating "see pg's 3, 6, 9, 13, and 17 of evidence submitted from
    plaintiff's full tracking records."  (ECF No. 58 at 98.)  However, as explained in footnote 3,
26  *supra*, plaintiff's "full tracking records" supports undisputed fact 61 as written.

27  [20]  Plaintiff denies this fact, but fails to submit evidence demonstrating that he received third level
28  responses.

1   12.)

2   VI.   Alleged Failure to Exhaust

3        A.   Exhaustion of Administrative Remedies

4        The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be

5   brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a

6   prisoner confined in any jail, prison, or other correctional facility until such administrative

7   remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion

8   requirement applies to all inmate suits about prison life, whether they involve general

9   circumstances or particular episodes, and whether they allege excessive force or some other

10  wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

11       Proper exhaustion of available remedies is mandatory, Booth v. Churner, 532 U.S. 731,

12  741 (2001), and "[p]roper exhaustion demands compliance with an agency's deadlines and other

13  critical procedural rules[.]"  Woodford v. Ngo, 548 U.S. 81, 90 (2006).  The Supreme Court has

14  also cautioned against reading futility or other exceptions into the statutory exhaustion

15  requirement.  See Booth, 532 U.S. at 741 n.6.  Moreover, because proper exhaustion is necessary,

16  a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise

17  procedurally defective administrative grievance or appeal.  See Woodford, 548 U.S. at 90-93.

18  "[T]o properly exhaust administrative remedies prisoners 'must complete the administrative

19  review process in accordance with the applicable procedural rules,' [] - rules that are defined not

20  by the PLRA, but by the prison grievance process itself."  Jones v. Bock, 549 U.S. 199, 218

21  (2007) (quoting Woodford, 548 U.S. at 88).  See also Marella v. Terhune, 568 F.3d 1024, 1027

22  (9th Cir. 2009) ("The California prison system's requirements 'define the boundaries of proper

23  exhaustion.'") (quoting Bock, 549 U.S. at 218).

24       In California, prisoners may appeal "any policy, decision, action, condition, or omission

25  by the department or its staff that the inmate or parolee can demonstrate as having a material

26  adverse effect upon his or her health, safety, or welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).

27  On January 28, 2011, California prison regulations governing inmate grievances were revised.

28  Cal. Code Regs. tit. 15, § 3084.7.  Now inmates in California proceed through three levels of

appeal to exhaust the appeal process:  (1) formal written appeal on a CDC 602 inmate appeal form, (2) second level appeal to the institution head or designee, and (3) third level appeal to the Director of the California Department of Corrections and Rehabilitation ("CDCR").  Cal. Code Regs. tit. 15, § 3084.7.  Under specific circumstances, the first level review may be bypassed.  Id. The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's administrative remedies.  See id. § 3084.7(d)(3).  Since 2008, medical appeals have been processed at the third level by the Office of Third Level Appeals for the California Correctional Health Care Services.

A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to him.  Butler v. Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir. 2002).  Since the 2011 revision, in submitting a grievance, an inmate is required to "list all staff members involved and shall describe their involvement in the issue."  Cal. Code Regs. tit. 15, § 3084.2(3).  Further, the inmate must "state all facts known and available to him/her regarding the issue being appealed at the time," and he or she must "describe the specific issue under appeal and the relief requested."  Cal. Code Regs. tit. 15, §§ 3084.2(a)(4).  An inmate has thirty calendar days to submit his or her appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed."  Cal. Code Regs. tit. 15, § 3084.8(b).

Failure to exhaust is "an affirmative defense the defendant must plead and prove."  Bock, 549 U.S. at 204, 216.  In 2014, the Ninth Circuit agreed with the underlying panel's decision[21] "that the burdens outlined in Hilao [v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996),] should provide the template for the burdens here."  Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc) (hereafter "Albino").  A defendant need only show "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."  Albino, 747 F.3d at 1172.  Once the defense meets its burden, the burden shifts to the plaintiff to show that the

---

[21]  See Albino v. Baca, 697 F.3d 1023, 1031 (9th Cir. 2012).  The three judge panel noted that "[a] defendant's burden of establishing an inmate's failure to exhaust is very low."  Id. at 1031. Relevant evidence includes statutes, regulations, and other official directives that explain the scope of the administrative review process.  Id. at 1032.

1  administrative remedies were unavailable.  See Albino, 747 F.3d at 1172.

2          A prisoner may be excused from complying with the PLRA's exhaustion requirement if

3  he establishes that the existing administrative remedies were effectively unavailable to him.  See

4  Albino, 747 F.3d at 1172-73.  When an inmate's administrative grievance is improperly rejected

5  on procedural grounds, exhaustion may be excused as effectively unavailable.  Sapp v. Kimbrell,

6  623 F.3d 813, 823 (9th Cir. 2010); see also Nunez v. Duncan, 591 F.3d 1217, 1224-26 (9th Cir.

7  2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable");

8  Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (prisoner not required to proceed to third

9  level where appeal granted at second level and no further relief was available).

10         If under the Rule 56 summary judgment standard, the court concludes that plaintiff has

11  failed to exhaust administrative remedies, the proper remedy is dismissal without prejudice.

12  Wyatt v. Terhune, 315 F.3d 1108, 1120, overruled on other grounds by Albino, 747 F.3d 1162.

13         B.  Discussion

14         Here, the question for the court is whether plaintiff exhausted his administrative remedies

15  regarding his claims against defendants Marquez and Jefferson, Blackwell, Swarthout, Arthur,

16  and McGriff, and if he did not, whether plaintiff's failure to meet the pre-filing exhaustion

17  requirement may be excused.  See Sapp, 623 F.3d at 823-24.

18              1.  Defendants Jefferson and Marquez

19         Plaintiff alleges that defendants Jefferson and Marquez, Special Agents with the OCS,

20  were critical-decision makers in his alleged wrongful gang validation, and it is undisputed that

21  they validated plaintiff as a BGF gang member on March 23, 2011.  Defendants contend that

22  plaintiff did not include defendants Jefferson and Marquez in any of his appeals challenging the

23  gang validation; rather, plaintiff's focus was on the validation investigation at the prison level.

24  (ECF No. 36-1 at 35.)  The only appeal challenging the gang validation was Appeal No. SOL-11-

25  00229 (ECF No. 38-1 at 11), and defendants argue that plaintiff did not specifically name

26  defendants Jefferson and Marquez as required under new prison regulations.

27         However, review of plaintiff's initial appeal reflects that plaintiff signed his 602 appeal on

28  January 11, 2011, before the new appeal regulations were adopted on January 28, 2011.  His

18

1    appeal was received on January 25, 2011, before the new regulations were implemented.

2    Moreover, in his appeal he states that on December 23, 2010, he submitted the validation package

3    to defendant McGriff for submission to OCS for review.  (ECF No. 38-1 at 17.)  Plaintiff makes

4    clear throughout his appeal that he challenged the gang validation, specifically the source items

5    used to validate him.  Thus, the court finds that plaintiff's allegations in Appeal No. SOL-11-

6    00229 were sufficient to put prison officials on notice of his claims challenging the gang

7    validation decision, and therefore exhaust plaintiff's claims against defendants Jefferson and

8    Marquez.  Accordingly, defendants' motion on these grounds should be denied.

9            2.  Defendants Blackwell, Swarthout, Arthur, and McGriff

10                1.  Did plaintiff exhaust?

11          The undisputed evidence shows that plaintiff did not exhaust his administrative remedies,

12   through the third level of review, regarding his due process claims against defendant Blackwell

13   and Yehuda concerning the October 30, 2010 placement in the ASU, and defendants Swarthout,

14   Arthur, and McGriff, regarding their roles in the 2010 and April 2011 ICC hearings.  Plaintiff

15   identifies a number of appeals that received third level decisions (ECF No. 58 at 319), but, as set

16   forth below, such appeals do not address the alleged due process violations by these defendants:

17          a.  Appeal Log No. SOL-11-00229.  This appeal challenges plaintiff's March 23, 2011

18   gang validation, and addresses complaints about the investigation into plaintiff's gang validation

19   by defendants McGriff and Soria.  (ECF No. 38-1 at 11-58.)

20          b.  Appeal Log No. SOL-11-01011.  This appeal addresses complaints against Officer

21   Fanning.  (ECF No. 38-2 at 1-34.)

22          c.  Appeal Log No. PBSP 12-00165.  This appeal addresses complaints against staff at

23   Pelican Bay State Prison.  (ECF No. 38-3 at 1-68.)

24          d.  Appeal Log No. SOL-11-01004.  This appeal addresses due process complaints against

25   the August 2011 ICC committee.  (ECF No. 38-4 at 1-42.)

26          e.  Appeal Log No. PBSP-12-01350.  This appeal addresses complaints against staff at

27   Pelican Bay State Prison.  (ECF No. 38-4 at 43-77.)

28          Moreover, defendants submitted unrefuted evidence that plaintiff submitted no other

19

1   relevant appeals that were accepted for review at the third level of review concerning plaintiff's

2   claims against defendants Blackwell, Swarthout, Arthur, and McGriff.  (ECF Nos. 38-1 at 3-5;

3   39-3 at 2-9.)  Thus, defendants have carried their burden of showing that plaintiff did not exhaust

4   his available remedies.  Consequently, the burden shifts to plaintiff to come forward with

5   evidence "showing that there is something in his particular case that made the existing and

6   generally available administrative remedies effectively unavailable to him."  Albino, 747 F.3d at

7   1172.

8                    2.  Is plaintiff excused from exhausting?

9        The Ninth Circuit has recognized that administrative remedies may be rendered

10  effectively unavailable if prison officials improperly screen out an inmate appeal.  Sapp, 623 F.3d

11  at 822-23.  To satisfy this exception to the exhaustion requirement, a plaintiff must show "(1) that

12  he actually filed a grievance or grievances that, if pursued through all levels of administrative

13  appeals, would have sufficed to exhaust the claim that he seeks to pursue in federal court, and (2)

14  that prison officials screened his grievance or grievances for reasons inconsistent with or

15  unsupported by applicable regulations."  Id. at 823-24.  See also Nunez, 591 F.3d at 1224-26

16  (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Brown

17  v. Valoff, 422 F.3d at 940 (plaintiff not required to proceed to third level where appeal granted at

18  second level and no further relief was available).  Plaintiff bears the burden of demonstrating that

19  the administrative remedies were rendered unavailable to him through no fault of his own.  Sapp,

20  623 F.3d at 822-23.

21                    a.  Defendant Blackwell and Yehuda

22       Plaintiff claims that on October 30, 2010, defendants Yehuda and Blackwell wrongfully

23  placed plaintiff in the ASU.  (ECF No. 1 at 8.)  However, it is undisputed that defendant

24  Blackwell signed the order placing plaintiff in the ASU on October 30, 2010.  Plaintiff submits

25  appeal forms dated November 3 and 28, 2010,[22] and handwritten notations on copies of appeal

26

27  [22]  The second page of the attachment to the November 28, 2010 appeal identifies Lt. Blackwell
     in a paragraph entitled, "Conclusion," that is set forth after and below plaintiff's signature.  (ECF
28  No. 58 at 104.)

1   history printouts in which he circles the alleged appeals.  (ECF No. 58 at 101, 102; Undisputed

2   Fact ("UDF") 18 & n.4 *supra*).  He claims these appeals were improperly screened out by prison

3   officials.  However, the appeal forms do not reflect receipt by the appeals office, and do not

4   indicate when or why they were screened out.  (ECF No. 58 at 101-02.)  Plaintiff did not provide

5   copies of any letters or other forms from the appeals office screening out either appeal, and fails

6   to provide any factual allegations as to his efforts to exhaust these November 2010 appeals.

7        Plaintiff cites to pages 3, 6, 9, 13 and 17 of his inmate tracking appeal log to support his

8   contention that his November 3, 2010 appeal was "screened out" by the appeals coordinator.

9   (ECF No. 58 at 87.)  However, review of such pages reveals no dates and no identifying

10  information for the appeals circled by plaintiff, other than labels:  "staff complaints" and

11  "segregation hearings."  (ECF No. 58 at 108, 111, 114, 118, 122.)[23]  Moreover, these tracking

12  records are maintained in chronological order.  On plaintiff's page 9, the dates of 11/3/10 and

13  11/28/10 are handwritten in, but the handwritten entries fall in between appeals filed June 2, 2011

14  and October 28, 2011.  (ECF No. 58 at 114.)  Thus, the appeals circled by plaintiff could not have

15  been filed in 2010 or within fifteen days of October 30, 2010, because the circled appeals were

16  received at some point between June 2, 2011, and October 28, 2011.  (Id.)

17       Plaintiff argues, in conclusory form, that he has exhausted all of his claims raised herein

18  because an inmate's appeal is considered exhausted if the inmate's appeal was obstructed by

19  prison officials.  (ECF No. 58 at 3.)  However, plaintiff provides no specific factual allegations

20  supporting his position that his 2010 appeals against defendant Blackwell were wrongfully

21  screened out or that his access to the appeals process was obstructed by prison officials.

22       Moreover, in his deposition, when he was asked to identify all appeals he submitted

23  against defendant Blackwell, plaintiff did not identify any screened out appeals.  Rather, plaintiff

24  identified Appeal No. CSP-S-12-00487 dated March 21, 2012, as the appeal in which he allegedly

25  pursued his claim against defendant Blackwell, although by the name "Jane Doe."  (Pl.'s Dep. at

26  80, 81.)  Defendants correctly argue that plaintiff cannot create a triable issue of material fact now

27

28
_____
[23]  In addition, as argued by defendants, the forms were printed on different dates.  (ECF No. 58 at 108 (4/27/12); 111, 114, & 118 (6/14/12); and 122 (12/28/12).  Plaintiff fails to explain why.

by relying on the alleged November 2010 appeal forms to contradict his prior deposition testimony.

In any event, appeal CSP-S-12-00487 could not have exhausted plaintiff's claim concerning his initial placement in the ASU on October 30, 2010.  Despite plaintiff's claims that form 602s were unjustly screened out or cancelled, the 2012 appeal does not mention the October 30, 2010 initial placement in the ASU, and he attributes the unjust screen outs to reprisals from incidents that occurred in 2011, after the initial ASU placement occurred.  (ECF No. 40-2 at 27.)  Plaintiff's first and second level appeals refer to his prior appeals filed in 2011.  (ECF No. 40-2 at 27, 28, 32-34.)  In the second level appeal response, the reviewer only recounted appeals filed by plaintiff in 2011, most of which challenged his gang validation and re-validation.  (ECF No. 40-2 at 35.)  Thus, even if the undersigned construed Appeal No. CSP-S-12-00487 to identify defendant Blackwell as "Jane Doe," the factual allegations set forth in the appeal did not put prison officials on notice that plaintiff challenged his initial placement in the ASU on October 30, 2010, and therefore cannot serve to exhaust such claim.

Because plaintiff adduced no evidence demonstrating that he was prevented from exhausting his claim against defendants Blackwell and Yehuda, or challenging his initial placement in the ASU, such claim should be dismissed without prejudice.

b. 2010 and April 2011 ICC Hearings

Plaintiff names defendants Swarthout, Arthur, and McGriff in connection with alleged due process violations that occurred in ICC hearings held in November 2010, December 2010, and April 2011.  Defendants adduced evidence that plaintiff submitted two appeals between June 2, 2011, and October 31, 2011, that were screened out and not assigned log numbers.  (ECF No. 39-3 at 7.)  One appeal addressed segregation hearings and the other was a staff complaint; the appeals coordinator was unable to locate copies of the appeals or any related screening letter.  (Id.)  Defendants note that plaintiff did receive a third level decision in Appeal No. CSP-SOL-11-01004, but argue that such appeal was limited to the August 2011 ICC members.  (ECF No. 36-1 at 36.)  Therefore, defendants contend that plaintiff failed to exhaust any alleged due process violations at the November and December 2010 and April 2011 ICC hearings.

Plaintiff counters that his appeals were unjustly screened out, excusing him from the exhaustion requirement.  (ECF No. 58 at 98.)  He refers to retaliation and reprisal in his opposition (ECF No. 58 at 3), but fails to offer any facts in support.[24]  Plaintiff provided no copies of letters or forms screening out such appeals, and does not provide any factual allegations to explain the basis for such screen outs or how the screen outs were improper.  Plaintiff fails to provide evidence that he re-submitted the appeals or made other attempts to further exhaust his claims.  Moreover, appeal No. CSP-SOL-11-01004, signed on September 21, 2011, could not exhaust plaintiff's claims based on due process violations that occurred in 2010 or April 2011, because the September 21, 2011 appeal would have been untimely to challenge such claims.  Cal. Code Regs. tit. 15, § 3084.8(b) (An inmate has thirty calendar days to submit appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed.")  In addition, as defendants argue, appeal No. CSP-SOL-11-01004 was focused on alleged violations that occurred at the August 25, 2011 hearing, and therefore would not exhaust the claims at issue from the earlier ICC hearings.  Sapp, 623 F.3d at 822-23.

Accordingly, plaintiff's due process claims arising from ICC hearings held November 2010, December 2010, and April 2011 should be dismissed without prejudice based on plaintiff's failure to exhaust administrative remedies.

### c. Conclusion

In conclusion, plaintiff should not be excused from the exhaustion requirement.  While the Ninth Circuit has recognized that the PLRA may not require exhaustion when circumstances beyond a prisoner's control render administrative remedies "effectively unavailable," Nunez, 591 F.3d at 1226; Sapp, 623 F.3d at 822-23, such unavailability is generally premised on the failure of prison officials to accord meaningful access to the administrative grievance process, or to provide

---

[24]  In his opposition, plaintiff also states that when his counselor, N. Danbacker, became appeals coordinator at PBSP, that is when the retaliatory reprisals started, when she erroneously and unjustly screened out and thwarted 5 of [his] 602 inmate appeals "without there being no just cause to do so," and did so on:  2/12/12; 2/29/12; 4/2/12; 6/28/12; and 12/29/11.  (ECF No. 58 at 50-51.)  These dates occurred long after plaintiff was required to exhaust his claim concerning his initial placement in the ASU on October 30, 2010, as well as his challenges to the 2010 and April 2011 ICC hearings, and thus are not relevant here.

1   meaningful review of a prisoner's grievance.  Plaintiff failed to adduce evidence demonstrating

2   that prison officials prevented him from fully and timely exhausting his administrative

3   grievances.

4        Thus, defendants' motion for summary judgment should be granted based on plaintiff's

5   failure to exhaust his administrative remedies as to his claims against defendant Blackwell and

6   Yehuda, and claims against defendants Swarthout, Arthur, and McGriff in connection with

7   alleged due process violations that occurred in ICC hearings held in November 2010, December

8   2010, and April 2011.

9   VI.   Claims re Gang Validation

10        Plaintiff challenges his initial placement in the ASU, the procedures by which he was

11   validated and the reliability of the source items underlying his validation, and the alleged denial

12   of witnesses and other due process violations at a subsequent review of his ASU confinement, as

13   well as his prolonged retention in the ASU.  The undersigned addresses each of these claims

14   below, as well as his post-validation claims against defendants Jackura and Stauss, his official

15   capacity claims, his claims brought pursuant to the settlement agreement in the case of Castillo v.

16   Terhune, No. C 94-2847 MJJ JCS (N.D. Cal. 1994).

17        When placement in administrative segregation impairs an inmate's liberty interest, the

18   Due Process Clause requires prison officials to provide the inmate with "some notice of the

19   charges against him and an opportunity to present his views to the prison official charged with

20   deciding whether to transfer him to administrative segregation."  Bruce v. Ylst, 351 F.3d 1283,

21   1287 (9th Cir. 2003) (quoting Toussaint v. McCarthy, 801 F.2d 1080, 1099 (9th Cir. 1986),

22   overruled on other grounds by Sandin v. Connor, 515 U.S. 471 (1995)).

23        In addition to the notice and opportunity for presentation requirements, due process

24   requires prison officials to have an evidentiary basis for their decision to place an inmate in

25   segregation for administrative reasons.  See Superintendent v. Hill, 472 U.S. 445, 455 (1985);

26   Toussaint v. McCarthy, 801 F.2d at 1104-05.  The evidentiary basis is satisfied if there is "some

27   evidence" from which a court can deduce an administrative tribunal's conclusion.  Hill, 472 U.S.

28   at 455; Toussaint v. McCarthy, 801 F.2d at 1105.  The evidence relied upon must have "some

1   indicia of reliability." <u>See</u> <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995).  This

2   "some evidence" test applies to an inmate's placement in SHU for gang affiliation.  <u>Castro v.</u>

3   <u>Terhune</u>, 712 F.3d 1304, 1307 (9th Cir. 2013) (citing <u>Bruce</u>, 351 F.3d at 1287).

4          Finally, due process requires that prison officials engage in some sort of periodic review

5   of an inmate's confinement in segregation.  <u>See</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 477 n.9 (1983),

6   <u>abrogated in part on other grounds by</u> <u>Sandin</u>, 515 U.S. 472; <u>Toussaint v. McCarthy</u>, 801 F.2d at

7   1101.  These periodic reviews must be more than "meaningless gestures" to satisfy due process.

8   <u>See</u> <u>Toussaint v. McCarthy</u>, 926 F.2d 800, 802-03 (9th Cir. 1990).

9          A.  <u>Plaintiff's Initial Placement in the ASU</u>

10         Despite plaintiff's failure to exhaust his due process challenge to his initial placement in

11  the ASU on October 30, 2010, the undisputed facts demonstrate that plaintiff received notice and

12  an opportunity to be heard within a reasonable time (UDF 13, 19, 20, 21), which meets federal

13  due process standards.

14         B.  <u>Gang Validation Procedures</u>

15         The court now turns to plaintiff's due process claims in connection with the gang

16  validation decision.  Plaintiff alleges that on March 23, 2011, Special Agents Marquez and Jefferson

17  wrongfully validated plaintiff as a BGF member based on unreliable evidence; and that Marquez and

18  Jefferson were the critical decision-makers in plaintiff's gang validation.  (ECF No. 1 at 17.)  Plaintiff

19  contends he was improperly validated because two of the three pieces of evidence were improper.

20  Plaintiff argues that when a review was conducted after he filed this lawsuit, the review

21  concluded that the use of those two pieces of evidence was improper; in addition, he contends

22  there was insufficient investigation into plaintiff's alternative explanations; and there was

23  insufficient evidence about those investigations provided to plaintiff.

24         Defendants argue that no due process[25] violation occurred because plaintiff's validation

25  met the minimal some evidence standard.  (ECF No. 36-1 at 26.)  Defendants contend that

26

27  ───────────────────────

[25]  Defendants contend that no substantive due process violation occurred; however, in <u>Castro v.</u>
    <u>Terhune</u>, 712 F.3d at 1314, the Ninth Circuit explained that "procedural, not substantive, due
28  process guarantees inmates that their validation will be based on some evidence."  <u>Id.</u>

                                            25

1    plaintiff's claim that his rebuttal arguments were not thoroughly investigated is not relevant

2    because this court is limited to determining whether "some evidence" supported the decision.  In

3    the alternative, defendants contend that they are entitled to qualified immunity because in 2010

4    and 2011, plaintiff did not have a clearly established right to be free from continued placement in

5    the ASU, and it was not beyond debate that plaintiff's validation was unreasonable.

6          Plaintiff counters that the evidence upon which defendants relied to validate plaintiff was

7    unreliable and insufficient because they failed to link the address, 819 59th Street, to inmate

8    Taylor, and failed to demonstrate this address was used for gang communication.  (ECF No. 58 at

9    74.)  Plaintiff claims he subsequently proved the true identity of "Yero Askari," and that 819 59th

10   Street belonged to Mr. Washington's girlfriend, rebutting the alleged link to inmate Taylor.  (ECF

11   No. 58 at 75.)  Plaintiff contends that the references to Dragon Regime and Regime Guerillaz are

12   not gang-related, but are in fact references to a rap group and are found on the internet and in an

13   urban hip hop magazine, and were not recognized by the CDCR as gang signs or slogans at the

14   time of plaintiff's validation.  (ECF No. 58 at 76-78.)  Plaintiff admits possession of inmate

15   Thomas' address, but claims plaintiff was provided Thomas' address by a correctional officer in

16   2005 to subpoena Thomas for plaintiff's appeal.  (ECF No. 58 at 79.)  Plaintiff contends that he

17   did not know Thomas was a gang member, or had been validated, and denies that he ever

18   contacted Thomas.  Plaintiff argues that he had Thomas' address for over five years, long before

19   Thomas was validated as a gang member on September 30, 2010.  (ECF No. 58 at 80.)  Plaintiff

20   contends that because he was separated from his property and housed in the ASU during the time

21   Thomas was validated, he could not have known about Thomas' gang validation.  (ECF No. 58 at

22   80.)  Finally, plaintiff argues that defendants failed to demonstrate that he had any association

23   with Thomas or Taylor:  no phone calls, letters, or other associations.  (ECF No. 58 at 81.)

24         In reply, defendants contend that plaintiff received a validation package regarding his

25   affiliation with the BGF on December 22, 2010, before the package was forwarded to OCS, and

26   the package contained copies of the non-confidential source items and CDCR Forms 1030 for the

27   confidential source items, all providing plaintiff adequate notice.  (ECF No. 63 at 4.)  Defendants

28   argue that plaintiff was afforded a meaningful opportunity to be heard when he provided

1   defendants McGriff and Soria a written rebuttal to the evidence in the validation package on

2   December 23, 2010.  Defendants note that the undisputed evidence shows that OCS defendants

3   Marquez and Jefferson considered plaintiff's written rebuttal; thus, plaintiff received an

4   opportunity to express his views concerning the evidence.  Despite plaintiff's claim that

5   defendant Soria failed to consider the rebuttal evidence, defendants note that it is undisputed that

6   defendants Marquez and Jefferson made the final gang validation decision.

7       Further, defendants argue that there was "some evidence" to support the gang validation:

8   plaintiff's possession of a third party address for a validated gang associate; the 128-B Askari

9   contained some indicia of reliability because prison officials linked it to a validated BGF

10  member; and the sworn statements from prison officials with personal knowledge that OCS

11  recognizes the terms "dragon regime" and "regime guerilla" as having a BGF connection.  (ECF

12  No. 63 at 6-7.)  Moreover, defendants point out that plaintiff argued in his written rebuttal to the

13  gang validation that the terms have an innocuous, alternative meaning, and the OCS defendants

14  considered the rebuttal prior to finding that plaintiff should be validated.

15      The United States Supreme Court has held that the procedural protections guaranteed by

16  the Fourteenth Amendment Due Process Clause apply when a constitutionally protected liberty or

17  property interest is at stake.  See Wilkinson v. Austin, 545 U.S. 209, 221 (2005); see also Marsh

18  v. County of San Diego, 680 F.3d 1148, 1155 (9th Cir. 2012) ("Once a state creates a liberty

19  interest, it can't take it away without due process.").  The Due Process Clause itself does not give

20  prisoners a liberty interest in avoiding transfer to more adverse conditions of confinement.  See

21  Meachum v. Fano, 427 U.S. 215, 225 (1976).  However, states may create liberty interests which

22  are protected by the Due Process Clause.  These circumstances generally involve a change in

23  condition of confinement that imposes an "atypical and significant hardship on the inmate in

24  relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484.

25      Although temporary confinement in administrative segregation typically does not

26  implicate a protected liberty interest, imposition of an indeterminate SHU term as a result of a

27  gang validation constitutes a much greater deprivation.  See Madrid, 889 F. Supp. at 1271

28  ("defendants may not confine prison gang members in the SHU, nor hold them there on

1    indeterminate terms, without providing them the quantum of procedural due process required by

2    the Constitution."); Suarez v. Cate, 2014 WL 996018 at *8 (E.D. Cal. Mar. 13, 2014) (plaintiff's

3    placement in the SHU for an indefinite term based on his gang affiliation implicated a protected

4    liberty interest such that defendants were constitutionally required to provide plaintiff with certain

5    minimal procedural due process protections); Castro v. Prouty, 2011 WL 529493 at *3 (E.D. Cal.

6    Feb. 3, 2011) (citing Wilkinson, 545 U.S. at 223-25 and assuming that confinement in the SHU

7    for an indeterminate period implicates a protected liberty interest), aff'd, 478 Fed. App'x 449 (9th

8    Cir. 2012). Accordingly, the undersigned concludes that plaintiff had a protected liberty interest

9    at stake in avoiding an indeterminate ASU term in segregation and was entitled to certain minimal

10   procedural due process protections in connection with such confinement.

11        When placement in administrative segregation impairs an inmate's liberty interest, the

12   Due Process Clause requires prison officials to provide the inmate with "some notice of the

13   charges against him and an opportunity to present his views to the prison official charged with

14   deciding whether to transfer him to administrative segregation." Bruce, 351 F.3d at 1287

15   (quoting Toussaint v. McCarthy, 801 F.2d at 1099.

16        In addition to the notice and opportunity for presentation requirements, due process

17   requires prison officials to have an evidentiary basis for their decision to place an inmate in

18   segregation for administrative reasons. See Superintendent v. Hill, 472 U.S. 445, 455 (1985);

19   Toussaint v. McCarthy, 801 F.2d at 1104-05. The evidentiary basis is satisfied if there is "some

20   evidence" to support the validation decision. Bruce, 351 F.3d at 1287, citing Hill, 472 U.S. at

21   455; Toussaint v. McCarthy, 801 F.2d at 1105. A single piece of evidence may satisfy this "some

22   evidence" requirement if the evidence has a "sufficient indicia of reliability." Bruce, 351 F.3d at

23   1288. As summarized by the Ninth Circuit:

24            "Some evidence" review requires us to ask only "whether there is
              any evidence in the record that could support the conclusion."
25            Bruce, 351 F.3d at 1287 (emphasis added). This test is "minimally
              stringent." Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994).
26            Accordingly, "we do not examine the entire record, independently
              assess witness credibility, or reweigh the evidence." Bruce, 351
27            F.3d at 1287. Evidence only must bear "some indicia of reliability"
              to be considered "some evidence." Toussaint v. McCarthy, 926
28            F.2d [at] 803 [ ]. Moreover, evidence may qualify as "some

1    evidence," even if it does not "logically preclude[ ] any conclusion
2    but the one reached." Hill, 472 U.S. at 457.

3    Castro v. Terhune, 712 F.3d at 1314.

4               1. Notice and Opportunity To Be Heard

5          Turning now to the question of whether plaintiff received the minimal procedural due

6    process protections required, as an initial matter, the undersigned finds that based on the evidence

7    submitted on summary judgment and described above, the defendants have borne their initial

8    burden of demonstrating that there is no genuine issue of material fact with respect to plaintiff's

9    Fourteenth Amendment claim.  Specifically, evidence submitted by defendants in support of their

10   motion demonstrates that they provided plaintiff with all of the procedural due process

11   protections required.  See Toussaint v. McCarthy, 801 F.2d at 1099 (prison officials must provide

12   inmate with "some notice of the charges against him and an opportunity to present his views to

13   the prison official charged with deciding whether to transfer him to administrative segregation.").

14         In light of the evidence submitted by the defendants in support of the pending motion for

15   summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of

16   material fact with respect to his claim.  The undersigned has reviewed plaintiff's complaint and

17   his lengthy opposition to defendants' pending motion.  The court is required to believe plaintiff's

18   evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor.

19   Drawing all reasonable inferences in his favor, the undersigned finds that plaintiff has not come

20   forward with evidence on summary judgment suggesting that the defendants violated his right to

21   due process when they validated him as a member of the BGF prison gang.

22         Here, the undisputed evidence demonstrates that plaintiff received adequate notice of the

23   gang charge.  On December 22, 2010, defendants Soria and McGriff provided plaintiff with a

24   gang-validation package containing five source items.  (UDF 26.)  More than 24 hours later, on

25   December 23, 2010, plaintiff provided to defendants Soria and McGriff a written rebuttal denying

26   gang involvement and addressing the documents used in the validation package.  (UDF 37.)

27         Plaintiff contends that certain questions were not addressed in the validation package, and

28   the IGI failed to define the term "regime."  (ECF No. 58 at 307; see also ECF No. 58 at 89, 291,

                                             29

1   309, 331.)  However, prison officials were not required to include such details in their notice to

2   satisfy due process.  See Toussaint v. McCarthy, 801 F.2d at 1100-01 ("the due process clause

3   does not require detailed written notice of the charges."); see also Manibusan v. Alameida, 2006

4   WL 496041 at *5 (N.D. Cal. Feb. 28, 2006) (the undisputed evidence showed the prisoner

5   received sufficient notice because the "pieces of information relied upon to validate [the prisoner]

6   as a gang member . . . were placed in his file and were available to him for reviewing," along with

7   copies of the chronos).

8       In addition, the undisputed evidence before this court on summary judgment demonstrates

9   that plaintiff had ample opportunity to present his views to the prison officials charged with

10  validating him as a BGF gang member.  On December 23, 2010, plaintiff provided, to defendants

11  Soria and McGriff, plaintiff's written rebuttal denying gang involvement and addressing all

12  documents used in the validation package.  Defendant Soria determined that plaintiff's rebuttal

13  evidence did not sufficiently refute the evidence, and forwarded plaintiff's validation package to

14  the OCS for review.  (UDF 38.)  The Special Services Unit of OCS consisting of defendants

15  Marquez and Jefferson reviewed that package, including plaintiff's rebuttal statement, and

16  determined that all source items submitted met the validation requirements.

17      Plaintiff acknowledges that he had an opportunity to submit his rebuttal statement to

18  defendants Soria and McGriff.  However, he contends that he was not provided an interview, and

19  was prevented access to evidence in his property that would have helped him challenge the gang

20  validation, and declares that because Soria failed to consider plaintiff's rebuttal, he did not

21  receive a meaningful opportunity to be heard.  (ECF No. 58 at 34, 30-22, 323-25.)  Defendants

22  Soria and McGriff both declare that plaintiff was provided an interview, and was allowed an

23  opportunity to express his views at the time he submitted his written rebuttal.  Although plaintiff

24  declares he was not provided an interview or further opportunity to obtain further evidence from

25  his property, his argument is unavailing because it is one based on form over substance.  See

26  Hewitt, 459 U.S. at 476 ("Ordinarily a written statement by the inmate will accomplish this

27  purpose . . . .  So long as this occurs, and the decision maker reviews the charges and then-

28  available evidence against the prisoner, the Due Process Clause is satisfied.").  It is undisputed

1   that plaintiff submitted his written rebuttal, which constituted his opportunity to express his

2   views.

3          Moreover, plaintiff has come forward with no competent evidence contradicting the sworn

4   declaration of defendant Soria, the IGI, in which Soria states that Soria reviewed and considered

5   plaintiff's rebuttal arguments and determined that the evidence supported Soria's conclusion that

6   plaintiff met the criteria to be validated as a member of the BGF prison gang.  See, e.g., Suarez,

7   2014 WL 996018 at *10-11 (due process requirement satisfied by providing prisoner with an

8   opportunity to be heard by providing the prisoner with an opportunity to submit written

9   objections to Assistant IGI Harrison for IGI St. Andre's review), adopted as modified on other

10  grounds by 2014 WL 2745724 (E.D. Cal. June 17, 2014).[26]  Moreover, the Toussaint v. McCarthy

11  factors do not implicate a right to have the information presented by the inmate "properly

12  investigated."  Id., 801 F.2d at 1099.  A plain reading of Toussaint v. McCarthy indicates that it is

13  sufficient to satisfy due process that plaintiff was afforded a chance to be heard, which he was in

14  this instance.  Plaintiff argues that if his claims were investigated, the gang validation would be

15  revoked because he is not a gang member.  But such argument focuses on the outcome of the

16  validation rather than the actual process plaintiff was afforded.  "A losing party who asserts that

17  the adjudicating entity didn't really consider the evidence does not show a triable issue of fact

18  simply by making the assertion.  The fact that [the prisoner] may not have been believed did not

19

20  [26]  Some district courts have concluded that the IGI is the critical decision-maker responsible for a
    prisoner's transfer to the SHU based upon a gang validation.  Compare Perez v. Woodford, 2010
21  WL 3943536 at *7 (E.D. Cal. Oct. 1, 2010) ("In the case of administrative segregation founded
    upon positive gang validation, the official charged with deciding whether to transfer or retain an
22  inmate in administrative segregation is the IGI."), with Stewart, 418 F. Supp. 2d at 1165 (N.D.
    Cal. 2006) (the prisoner found to be entitled to "informal nonadversary hearing" before the ICC
23  prior to its decision to retain him in SHU based on gang validation); Guizar v. Woodford, 2007
    WL 951294 at *5 (N.D. Cal. Mar. 27, 2007) (prison officials "charged with deciding" whether to
24  retain plaintiff in administrative segregation and send him to the SHU indefinitely based on his
    gang validation were the ICC officials present at hearings), aff'd in part, rev'd in part on other
25  grounds by, 282 Fed. App'x 551, 2008 WL 2403000 (9th Cir. June 11, 2008).  See also Lopez v.
    Cook, 2011 WL 2493787 at *3 (E.D. Cal. June 22, 2011) (prisoner's reliance on cases where the
26  critical decision maker was found to be the IGI was misplaced because those cases were based on
    experiences at other prisons), aff'd in part, rev'd in part, 533 Fed. Appx. 763 (9th Cir. 2013).
27  Here, both the IGI and the OCS Special Agents reviewed plaintiff's written rebuttal before
    making their decisions.
28

1   render the reviews meaningless or deny him procedural due process."  Andrade v. Lewis, 2013

2   WL 5694331, *5 (N.D. Cal. Oct. 18, 2013).

3        In addition, here it is undisputed that the OCS is charged with making a final

4   determination as to whether an inmate is validated as a gang member.  Insofar as the OCS is the

5   critical decision-maker, plaintiff provided no evidence to contradict the sworn declarations of

6   defendants Marquez and Jefferson who declare that they also reviewed and considered plaintiff's

7   rebuttal statement in considering his gang validation.  See Madrid, 889 F. Supp. at 1276 ("When

8   we consider the opportunities for hearing before the IGI and the ICC together, and the record as a

9   whole, we decline to find that the process provided to the class is no more than a meaningless

10  gesture.").

11       Based on the foregoing, plaintiff was provided the process due under Toussaint v.

12  McCarthy.  Prior to his validation, plaintiff understood that he was subject to gang validation, he

13  was made aware of the source items supporting the validation, and he was afforded an

14  opportunity to present his views to the relevant decision makers.  Thus, the undisputed facts

15  reflect that plaintiff received notice and an opportunity to be heard prior to the validation

16  decision, comporting with federal due process.

17            2.  "Some Evidence"

18       Defendants' evidence also demonstrates that plaintiff's gang validation was supported by

19  some evidence with some indicia of reliability.  (ECF No. 37-4.)  Although plaintiff claims that

20  defendants validated him based on unreliable evidence, the undisputed evidence before the court

21  on summary judgment in this case demonstrates otherwise.  Specifically, plaintiff was validated

22  on the basis of three items plaintiff concedes were found in his cell:  a piece of paper with

23  "Spencer Thomas, 978 69th Ave., Oakland, Ca," written on it; a piece of paper with the words

24  "Yero Askari" and an address 819 59th Street, Oakland, CA; and a piece of paper that contained

25  the words "Regime Guerrilla" and "Dragon Regime."  (UDF 27, 31, 33.)

26       As set forth above, the Ninth Circuit has made clear that the "some evidence" review only

27  requires the court to determine whether any evidence could support the validation decision.

28  Castro v. Terhune, 712 F.3d at 1314.  This court may "not examine the entire record,

1    independently assess witness credibility, or reweigh the evidence." Bruce, 351 F.3d at 1287.

2    Thus, any one of these three pieces of evidence could suffice to support the validation provided

3    the evidence has sufficient indicia of reliability. Bruce, 351 F.3d at 1288.

4         Here, under federal due process standards, plaintiff's undisputed possession of a piece of

5    paper bearing the following name and address: "Spencer Thomas, 978 69th Ave., Oakland, Ca,"

6    was sufficient to meet the minimally stringent "some evidence" standard. Investigation

7    determined that Spencer Thomas was a paroled, validated member of the prison gang BGF, and

8    the address was confirmed to be the address of Thomas' mother. (ECF No. 58 at 379.) Such

9    evidence had some indicia of reliability because Thomas was a validated BGF gang member, and

10   the address was confirmed to be his mother's address. Possession of a third-party address for a

11   validated gang associate is sufficient to meet the "some evidence" standard. Goolsby v. Gentry,

12   2014 WL 4930759, *6-7 (E.D. Cal. Sept. 29, 2014); Castro v. Prouty, 2011 WL 529493 at *4.

13   "[D]istrict courts throughout the Ninth Circuit have repeatedly held that an inmate's possession of

14   an address book containing validated inmates' contact information constitutes 'some evidence.'"

15   Bejarano v. Gower, 2015 WL 9391918 (E.D. Cal. Dec. 23, 2015) (collecting cases). Moreover,

16   on February 27, 2013, Senior Special Agent B. Kingston subsequently reviewed the evidence and

17   found the CDCR 128B-Thomas evidence met the validation requirements. (ECF No. 58 at 8.)

18        For the same reasons, plaintiff's possession of the paper containing the name Yero Askari

19   contained some indicia of reliability because prison officials identified the name as an alias used

20   by inmate Freddie Taylor, a validated BGF member on death row at San Quentin State Prison,

21   and contained an address which was determined to be a third party address for communications.

22   (ECF Nos. 37-2 at 60; 37-4 at 9.) But even if this paper was insufficient, the paper bearing

23   Thomas' name and his mother's address meet the minimal "some evidence" standard.

24        With regard to the paper containing the words, "Regime Guerrilla," and "Dragon Regime"

25   written on it, defendants provided the declaration of V. Marquez, Senior Special Agent, who

26   serves in the Special Service Unit ("SSU") of the OCS, and avers that such words "indicated an

27   association with the BGF, whose members/associates often use the words 'dragon' and

28   'guerilla'/'gorilla' as identifiers." (ECF No. 37-4 at 9.) Plaintiff argues that the OCS does not

1    recognize certain terms as having an association with BGF.  (ECF No. 58 at 291.)  But plaintiff

2    also conceded that "[i]t might be true that the words 'dragon and guerilla' might be gang-related

3    if, you take in the totality in which they have been used in the past!!!"  (ECF No. 58 at 291.)

4    Plaintiff's concession of a connection, however slight, is sufficient to meet the "some evidence"

5    requirement, particularly in light of his failure to submit competent evidence to refute Marquez'

6    declaration.  But even assuming, arguendo, that the paper bearing such words did not meet the

7    some evidence requirement, the paper with the name Thomas was sufficient to demonstrate some

8    evidence supported the validation decision.[27]

9          Plaintiff's alternative explanations for his possession of such evidence are not relevant on

10   federal due process review.  "The Federal Constitution does not require evidence that logically

11   precludes any conclusion but the one reached."  Hill, 472 U.S. at 457; see also Castro v. Terhune,

12   712 F.3d at 1314-15 (inmate's possession of two pictures containing gang-related symbols

13   constituted "some evidence" that the inmate was involved with the gang in question, and the

14   possibility that they could support competing inferences does not affect that conclusion);

15   Goolsby, 2014 WL 4930759 at *6 ("[d]ue process does not require that there be no alternative

16   explanation for evidence used in gang validation.")

17         To the extent that plaintiff contends that defendants failed to demonstrate that he

18   possessed the information for gang-related reasons, such argument also fails because defendants

19   are not required to prove that plaintiff had the information for gang related reasons.  See Andrade

20   v. Lewis, 2013 WL 5694331, *6 (N.D. Cal. 2013) ("In light of the well-recognized danger posed

21   by prison gangs, prison officials properly could determine that, by being affiliated with a gang,

22   the inmate does pose a threat and endanger institutional security because prison gangs endanger

23   institutional security.").

24         Finally, plaintiff describes an alleged smuggling conspiracy involving defendant McGriff.

25   ───────────────────

26   [27]  Plaintiff makes much of the fact that his gang validation was overturned in 2013.  However,
     Marquez declared that in 2013 the Title 15 regulations were being reviewed for modification of

27   the gang validation process, and that the SSU review committee's decision to accept the three
     pieces of evidence discussed here was "consistent with the regulations in effect during

28   [plaintiff's] validation in 2011."  (ECF No. 37-4 at 11.)

(ECF No. 58 at 42, 53-61, 63-71.)  As argued by defendants, even assuming the alleged smuggling operation took place, and assuming defendant McGriff was involved, such evidence is relevant only to the initiation of the gang validation process.  Plaintiff does not dispute that the three items used to validate him were taken from his cell, and does not argue that the three source items were fabricated or falsified.  In addition, it is undisputed that defendant Soria initially reviewed plaintiff's rebuttal evidence and forwarded the gang validation package to the OCS, and that defendants Marquez and Jefferson subsequently reviewed the package, along with plaintiff's rebuttal evidence, and made the validation decision.  Plaintiff adduced no evidence as to any involvement of Soria, Marquez or Jefferson in the alleged smuggling operation.  Moreover, it is undisputed that McGriff was not involved in the decision of Marquez and Jefferson to validate plaintiff as a gang member.

Accordingly, for all of the foregoing reasons, the undersigned concludes that defendants are entitled to summary judgment in their favor with respect to plaintiff's Fourteenth Amendment due process claim in which he challenges the gang validation decision.

### C. August 25, 2011 Subsequent ASU Review Hearing & Retention in ASU[28]

In his verified complaint, plaintiff alleges that his due process rights were violated by defendants Stauss, Hardy, and Jackura when plaintiff tried to place 17 due process violations on the record at this hearing, but was denied.  (ECF No. 1 at 20.)  Plaintiff claims he submitted such documentary evidence to the ICC and its board members to refute plaintiff's gang validation, but was denied.  (Id.)  Plaintiff also alleges that he handed Stauss such documents at the August 25, 2011 hearing to challenge the gang validation, but that Stauss did not forward the documents to OCS.  (UDF 57.)  Plaintiff also contends that defendant Jackura failed to take accurate notes at the hearing.  (UDF 58.)  In his deposition, plaintiff asserted that defendant Hardy wrongfully denied plaintiff's request for staff assistant, and request to call inmate Stevens as a witness.  (Pl.'s Dep. at 309-12.)  Plaintiff also recounted a summary of the 17 due process violations.  (Pl.'s Dep.

---

[28]  Plaintiff raised these due process claims in his administrative appeal Log No. SOL-11-01004, and received a third level appeal decision on July 27, 2012.  (ECF No. 38-4 at 2-42.)  Another ICC hearing was held in September of 2011 (Pl.'s Dep. at 334-57), but plaintiff included no allegations concerning such hearing in his complaint.  (ECF No. 1 at 1-24.)

1   at 347-57.)  In addition, plaintiff contends that his due process rights were violated by his

2   prolonged retention in the ASU allegedly without adequate review.

3        Defendants argue that plaintiff received the minimum process he was due, and that even if

4   plaintiff's due process rights were violated, they are entitled to qualified immunity.  Defendants

5   also contend that plaintiff fails to demonstrate defendant Stauss was responsible for the

6   subsequent ASU retention, because Stauss was not a committee member or a critical decision

7   maker, and that defendant Jackura's alleged failure to accurately document the minutes from the

8   meeting fails to state a cognizable civil rights claim.

9            1.  No Causal Link - Defendants Stauss and Jackura

10       The Civil Rights Act under which this action was filed provides as follows:

11           Every person who, under color of [state law] . . . subjects, or causes
             to be subjected, any citizen of the United States . . . to the
12           deprivation of any rights, privileges, or immunities secured by the
             Constitution . . . shall be liable to the party injured in an action at
13           law, suit in equity, or other proper proceeding for redress.

14   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

15   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  Harper v.

16   City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) ("In a § 1983 action, the plaintiff must

17   also demonstrate that the defendant's conduct was the actionable cause of the claimed injury.")  A

18   person deprives another of a constitutional right within the meaning of section 1983 if he does an

19   affirmative act, participates in another's affirmative act, or omits to perform an act which he is

20   legally required to do, that causes the deprivation of which the plaintiff complains.  See Starr v.

21   Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (supervisor liability under section 1983 requires

22   personal involvement in constitutional deprivation or sufficient causal connection between

23   supervisor's wrongful conduct and constitutional deprivation).

24       Here, the undersigned agrees that plaintiff fails to state a cognizable civil rights claim

25   against defendant Stauss based on his alleged failure to submit the written documentation.

26   Because it is undisputed that defendant Stauss was not a member of the ICC or OCS, and was not

27   a critical decision maker in retaining plaintiff in the ASU, plaintiff fails to state a cognizable due

28   process claim against defendant Stauss based on plaintiff's alleged wrongful retention in the

1    ASU.  Similarly, plaintiff's claim that defendant Jackura failed to accurately document the

2    minutes fails to state a cognizable civil rights claim.  Plaintiff does not have a constitutional right

3    to a particular recording of the minutes from an ICC meeting.

4         Therefore, both defendants Stauss and Jackura are entitled to summary judgment on such

5    claims.

6              2.  August 25, 2011 Review Hearing, Retention in ASU, and Qualified Immunity

7         It is undisputed that plaintiff was placed in the ASU on October 30, 2010, and he claims

8    he was held in the ASU for 2.5 years.  (ECF No. 1 at 23.)  Defendants argue that the state of the

9    law during plaintiff's placement and retention in the ASU from 2010 to 2011 was not sufficiently

10   specific to put defendants Swarthout, Arthur, Blackwell, Hardy, Jackura, McGriff, Soria, Stauss,

11   and Yehuda on notice that they needed to consider the merits of plaintiff's validation evidence

12   during subsequent reviews.  (ECF No. 36-1 at 31.)  Defendants also rely on Wilkinson, 545 U.S.

13   224, in which the Supreme Court found that an "atypical hardship" could be found where inmates

14   were held in segregated housing for extended periods of time where placement was reviewed only

15   annually after an initial thirty-day review.  (ECF No. 36-1 at 31.)  By contrast, plaintiff received

16   multiple placement reviews during his ASU stay, including four ICC hearings and a private

17   audience with defendant Swarthout, the ICC chairperson, to present plaintiff's evidence against

18   the gang validation.  (ECF No. 36-1 at 31, citing UDF 20, 39, 49, 51, 56.)  In addition, defendants

19   argue that plaintiff was not clearly entitled to a more meaningful review in 2010 and 2011,

20   because the law was unsettled as to "whether the absence of post-placement periodic, meaningful

21   review of confinement in a disciplinary-segregation unit may give rise to a protected liberty

22   interest."  Id., citing Brown v. Or. Dep't of Corr., 751 F.3d 983 (9th Cir. 2014).

23        Plaintiff counters that defendants are not entitled to qualified immunity because each

24   defendant personally participated in the alleged violations that led to plaintiff's alleged unlawful

25   and lengthy confinement in the ASU.  (ECF No. 58 at 2.)  Plaintiff contends that defendants

26   violated "Title 15," the CDCR Department of Operations Manual ("DOM"), and "clearly

27

28

1   established federal law."[29]  (ECF No. 58 at 2.)

2          "The doctrine of qualified immunity protects government officials 'from liability for civil

3   damages insofar as their conduct does not violate clearly established statutory or constitutional

4   rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223,

5   231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Resolving the defense of

6   qualified immunity involves a two-step process; the court must determine (1) whether the plaintiff

7   has alleged or shown a violation of a constitutional right, and (2) whether the right at issue was

8   clearly established at the time of defendant's alleged misconduct.  Pearson, 555 U.S. at 232 (citing

9   Saucier v. Katz, 533 U.S. 194, 201-02 (2001)).  These steps may be analyzed in any order.  Id. at

10  236.

11         "Qualified immunity is applicable unless the official's conduct violated a clearly

12  established constitutional right."  Pearson, 555 U.S. at 232.  To be clearly established "[t]he

13  contours of the right must be sufficiently clear that a reasonable official would understand that

14  what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

15  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate."

16         Initially, it is undisputed that following the March 23, 2011 validation decision, plaintiff

17  was given notice and an opportunity to be heard at several ICC hearings attended by plaintiff

18  where his retention in the ASU was reviewed.  (UDF 49-50 (Apr. 21, 2011), 56 (Aug. 25, 2011);

19  Pl.'s Dep. at 334-57 (Sept. 2011).)  Plaintiff also met with defendants Swarthout, McGriff and

20  Soria for about an hour on April 22, 2011, so that he could present his views.  (UDF 51.)[30]  Thus,

21  ───────────────────

22  [29]  Plaintiff also claims that he has a federal right to be free from unlawful confinement based on
    falsified evidence used to obtain a conviction or finding of validation.  (ECF No. 58 at 2.)  But
    plaintiff does not contend that the source items used to validate him were falsified.  Rather,
23  plaintiff contends that California Penal Code § 134 was violated by defendants McGriff and Soria
    when they concluded that "[u]pon reviewing the written response and after a thorough review of
24  the evidence, it was determined subject's claims have no merit, and warrant no further
    investigation," and defendant McGriff falsified state documents by marking "member" rather
25  than "associate" on plaintiff's gang validation package.  (ECF No. 58 at 272, 275).  At bottom,
    such disputes challenge the conclusions reached by the defendants, not the validity of the source
26  items found in plaintiff's cell.

27  [30]  Plaintiff was transferred away from HDSP in November of 2011 (Pl.'s Dep. at 134), and
28  subsequent review hearings were not addressed here.  He was released from the ASU in 2013.

1  the record shows that plaintiff received regular reviews of confinement more frequently than

2  every 120 days.  Hewitt, 459 U.S. at 477 n.9 ("This review will not necessarily require that prison

3  officials permit the submission of any additional evidence or statements."); see also Toussaint,

4  926 F.2d at 803 (due process satisfied by review of confinement in segregation every 120 days).

5       Plaintiff's due process claims regarding defendants' alleged failure to timely review and

6  reverse his SHU assignment, or challenging his prolonged retention in the ASU, are unavailing.

7  In Brown, the Ninth Circuit held, for the first time, that "a lengthy confinement without

8  meaningful review may constitute atypical and significant hardship. . . ." 751 F.3d at 989-90.

9  Brown was decided in April 2014 and held that this right was not clearly established before that

10  date.  Id.

11       Plaintiff's reliance on California Penal Code § 134[31] fails.  California's Penal Code is a

12  criminal statute that does not create a private right of action, and violations of criminal statutes

13  cannot serve as a basis for civil liability.  See Ellis v. City of San Diego, 176 F.3d 1183, 1189

14  (9th Cir. 1999) (affirming dismissal of sixteen causes of action predicated on violations of the

15  California Penal Code "[b]ecause these code sections do not create enforceable individual

16  rights.").  Similarly, plaintiff's reliance on Title 15 of the California Code of Regulations or the

17  DOM are unavailing.  A violation of prison regulations does not determine the outcome of the

18  federal due process analysis.  See Walker v. Sumner, 14 F.3d 1415, 1419-20 (9th Cir. 1994),

19  overruled on other grounds by Sandin, 515 U.S. 472.  Violation of state regulations or prison

20  policies, standing alone, cannot form the basis of a viable section 1983 claim.  See West v.

21  Atkins, 487 U.S. 42, 48 (1988).

22       Further, as noted supra, the Ninth Circuit did not conclude that lengthy confinement in

23  segregation without review could constitute an 'atypical and significant hardship' of the sort

24  invoking due process protections until 2014.  Brown, 751 F.3d at 989-90.  Given that the delay

25

26  [31] "Every person guilty of preparing any false or ante-dated book, paper, record, instrument in
   writing, or other matter or thing, with intent to produce it, or allow it to be produced for any
27  fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry
   whatever, authorized by law, is guilty of felony."  Cal. Penal Code § 134 (West).

28

1    plaintiff complains of occurred entirely in 2010 and 2011, prison officials cannot be held liable

2    for any violation of his rights associated therewith.  Id. ("Although we conclude that a lengthy

3    confinement without meaningful review may constitute atypical and significant hardship, our case

4    law has not previously so held, and we cannot hold defendants liable for the violation of a right

5    that was not clearly established at the time the violation occurred.").

6          Here, plaintiff was first housed in the ASU in 2010, and, was retained in the ASU until his

7    transfer away from HDSP in 2011.  Therefore, prison officials at HDSP cannot be held liable for

8    any violation of his due process rights associated therewith, because the right to such meaningful

9    review was not clearly established at that time.  Id.  Accordingly, even assuming a due process

10   violation by continued assignment to the ASU from October 30, 2010, until April of 2013, when

11   his gang validation was revoked, it was not clearly established as of that time that prolonged

12   assignment without review of the merits of the gang validation violated due process.  Id.  Thus,

13   defendants are entitled to qualified immunity as to plaintiff's retention in the ASU from 2010 to

14   2011.  Brown, 751 F.3d at 989-90; accord Valdez v. Beard, 2016 WL 4925824 (E.D. Cal. Sept.

15   16, 2016); Real v. Walker, 2015 WL 351525 (E.D. Cal. Jan. 26, 2015).

16                          4.  Castillo Settlement Agreement

17         Plaintiff also alleges that defendants failed to comply with the procedures the state agreed

18   to in the settlement agreement reached in Castillo v. Terhune, No. C 94-2847 MJJ JCS (N.D. Cal.

19   1994).[32]  Defendants have moved for summary judgment on this claim, arguing that plaintiff fails

20   to state a cognizable claim for relief.  The undersigned finds defendants' argument in this regard

21   to be persuasive as well.  See, e.g., Carranza v. Lewis, 2014 WL 2944082 at *5 (N.D. Cal. June

22   30, 2014) ("The [Castillo] settlement agreement (the existence of which the Court can take

23   judicial notice) does not provide a basis for a section 1983 claim for relief because it is not a

24   determination that there was any constitutional violation in the active/inactive review process and,

25   even if it did, a settlement agreement does not provide a right secured by the Constitution or laws

26

---

27   [32]  The settlement agreement in Castillo placed limitations on the items that could be used as
     source items, along with other changes to CDCR's gang validation procedures.  See Ruiz v.
28   Fischer, 2010 WL 4807052, at *3 (N.D. Cal. Nov. 18, 2010); Manibusan, 2006 WL 496041 at *6.

1    of the United States, the violation of which is a necessary element of a section 1983 claim.");

2    Suarez, 2014 WL 996018 at *17 (claims based on prison officials' alleged failure to comply with

3    the procedures agreed to in Castillo failed as a matter of law because "[t]he violation of consent

4    decrees, settlements, or injunctions in other cases does not provide liability in this action," and the

5    Castillo settlement agreement itself "'provides that alleged noncompliance with the agreement

6    cannot be the basis for granting an individual inmate relief regarding his gang validation.' Garcia

7    v. Stewart, 2009 WL 688887 *7 (N.D. Cal. Mar. 16, 2009) (citing Settlement Agreement

8    § 30c).").  Plaintiff's claims are no different from those presented in Carranza and Suarez.

9         Accordingly, the undersigned concludes that defendants are also entitled to summary

10   judgment in their favor on plaintiff's claims brought pursuant to the Castillo settlement

11   agreement.

12                  5.  Plaintiff's Official Capacity Claims

13        In his complaint, plaintiff sued defendants in their individual and official capacities.

14   Defendants have moved for summary judgment on plaintiff's official capacity claims for

15   damages, persuasively arguing that they are immune from suit under the Eleventh Amendment.

16        As the Supreme Court has recognized:

17             [A] suit against a state official in his or her official capacity is not a
               suit against the official but rather is a suit against the official's
18             office. As such, it is no different from a suit against the State itself.

19   Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)

20        In the absence of a waiver by the state or a valid congressional override, under the

21   Eleventh Amendment, state agencies are immune from private causes of action for damages

22   brought in federal court.  See Dittman v. California, 191 F.3d 1020, 1025-26 (9th Cir. 1999).

23   The State of California has not waived immunity under the Eleventh Amendment for claims

24   brought against it under § 1983.  Id.  In addition, the Supreme Court has held that Congress did

25   not intend for § 1983 to abrogate a state's Eleventh Amendment immunity.  Id.

26        Accordingly, the undersigned concludes that defendants are entitled to summary judgment

27   in their favor with respect to plaintiff's official capacity claims for damages.

28   ////

6. Conclusion

In sum, for all of the foregoing reasons, the undersigned recommends that defendants' motion for summary judgment be granted as to plaintiff's due process claims in connection with his initial placement in administrative segregation, and the 2010 and April 2011 hearings based on plaintiff's failure to exhaust administrative remedies, but denied as to dismissal of claims against defendants Jefferson and Marquez based on an alleged failure to exhaust administrative remedies. Further, the undersigned recommends that defendants' motion for summary judgment be granted as to plaintiff's due process challenges to his gang validation and to the post-validation reviews of his ASU placement. The undersigned further recommends that defendants' motion for summary judgment be granted with respect to any damages claims brought against defendants in their official capacity, any claims brought by plaintiff pursuant to the Castillo agreement, as well as plaintiff's post-validation claims against defendants Jackura and Stauss, because plaintiff's allegations with respect to such claims fail to state cognizable claims for relief.

VII. Request for Injunctive Relief

In his verified complaint, plaintiff seeks injunctive relief relating to the gang validation process, which defendants oppose. Because the undersigned recommends that defendants' motion for summary judgment be granted, plaintiff's claims for injunctive relief should be denied as moot.

VIII. Conclusion

In accordance with the above, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 36) be denied in part, and granted as follows:

1. Dismissal of plaintiff's claims against defendants Jefferson and Marquez based on an alleged failure to exhaust administrative remedies be denied;

2. Plaintiff's due process challenges to his October 30, 2010 initial placement in the ASU, and to the ICC classification hearings held on November 4, 2010, December 23, 2010, and April 21, 2011, be dismissed without prejudice based on his failure to exhaust administrative remedies; and

3. Judgment on plaintiff's remaining claims be granted;

42

4.  Plaintiff's request for injunctive relief be denied; and

5.  The Clerk be directed to enter judgment accordingly and close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 25, 2016

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/mabo2208.msjr

43